UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22-CR-62-MTS-ACL |
| | ) |
| TANARIUS D. TWIGGS, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**
**BY UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Tanarius D. Twiggs' Motion to Suppress Evidence.[1] (Docs. 47, 67, 71.) The Government opposes the Motion. (Docs. 54, 70.)

Twiggs argues that his constitutional rights were violated when officers searched the interior of his car without a warrant after he wrecked it. A firearm was discovered between the driver's and passenger front seats during an inventory search of his car at the scene of the accident. Twiggs notes that the Government relies on the inventory search exception to the warrant requirement to justify the search of his vehicle. He posits that "[w]hat is in dispute is whether rather than performing a Constitutionally allowable inventory search, the police actually conducted a warrantless search for contraband which they then disguised under the cloak of an inventory search." (Doc. 67 at 5.) Twiggs then argues that if the search was not pursuant to the tow policy, the seizure cannot be saved by the inevitable discovery doctrine. *Id*. at 4-7.

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

The Government counters that the inventory search was proper in that "the officers searched Twiggs' Charger because it was inoperable, blocked a Cape Girardeau sidewalk, and had to be towed pursuant to the tow policy of the Cape Girardeau Police Department." (Doc. 70 at 8.)  The Government argues alternatively that "[e]ven if the court finds that the sole purpose of the officers' search of the Charger was unrelated to conducting an inventory search of the Charger, Twiggs' pistol would have inevitably been found by any officer conducting an inventory search of the Charger." *Id*. at 9-10.

In consideration of the pleadings and evidence submitted by the parties along with the testimony[2] presented during the evidentiary hearing, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motion to Suppress Evidence be denied.

## I.  Findings of Fact

During the mid-afternoon of April 2, 2022, Cape Girardeau Police Officer Joseph Whistler was on routine patrol when he observed a blue Dodge Charger approaching his patrol vehicle.  Officer Whistler was traveling north on Sprigg Street.  The Charger was traveling at a high rate of speed in the opposite direction.  Officer Whistler was able to position his patrol car behind the Charger when it stopped at an intersection further south on Sprigg Street.

The driver and sole occupant of the vehicle (later identified as defendant Tanarius Twiggs) appeared to notice Officer Whistler behind him by using his side mirror.  Twiggs then rapidly accelerated west across Sprigg Street, nearly striking other vehicles.

---

[2] *See* Hearing Transcript, Doc. 63, referred to herein as "Tr."

Officer Whistler attempted a traffic stop of the Charger, but the Charger fled.  Officer Whistler pursued the vehicle for a short time, however, terminated the pursuit when his "patrol vehicle reached a speed of 75 miles per hour on the city streets. . .due to the large amount of pedestrian vehicle traffic."  (Tr. 21.)  Prior to the pursuit, the Charger failed to stop at a stop sign.  During the pursuit, the Charger failed to stop at approximately six stop signs.  According to Officer Whistler, the Charger reached an estimated speed of "close to 100 miles an hour possibly in excess of that on the city streets."  *Id*.

Shortly thereafter, Officer Whistler observed the Charger at the intersection of Independence and Ellis where it was continuing to travel "at extremely high rates of speed for city streets and the amount of traffic that was out at that time."  (Tr. 22.)  The driver, Twiggs, ultimately lost control of the Charger "and struck a large stone retaining wall that ran east to west along the north side of North Street."  (Tr. 23.)

When Officer Whistler arrived at the scene of the accident, he observed an unidentified female talking with Twiggs from the passenger side of the vehicle.  According to Officer Whistler, the passenger side door was already open, and the driver was "lean[ing] across the center console attempting to climb out of the passenger side of the vehicle, but it was apparent that he was unable to make that transition on his own."[3]  (Tr. 24.)   Officer Whistler ordered the female away from the vehicle, and she complied.  By then, the Charger was engulfed in flames.  Officer Whistler approached the passenger side of the vehicle and pulled Twiggs to safety near his patrol vehicle.

---

[3] On cross-examination, Officer Whistler explained that Twiggs' "rear was still in the driver's seat.  He was leaned over with his side leaning into the passenger seat from the driver's seat.  And it appeared as if he was trying to crawl from the driver's seat through the passenger seat outside of the vehicle." (Tr. 33-34.)

Body camera footage shows that by 2:52 p.m., Twiggs was safely lying in the middle of the road to the side of Whistler's patrol vehicle.[4] It was clear he was injured. Officers on the scene deduced that Twiggs had not been wearing his seatbelt and the steering wheel was broken. Police officers attempted to put the fire out with fire extinguishers, however, were unsuccessful. *See* Right image[5] below.

The damage to Twiggs' Charger was extensive. The collision rendered it inoperable. Officer Whistler explained that "[t]he entire front end of the vehicle appeared to be pushed back into the dashboard of the vehicle. It all kind of melded together." (Tr. 27.) The Charger was also blocking a sidewalk on North Street. *See* Left image[6] below.




Another Cape Girardeau Police Officer, Jason Angle, responded to the accident scene. When he arrived, he observed that the Charger had collided with the retaining wall on the north side of the intersection of North Street and Ellis Street. He also noticed there was a fire in the engine compartment of the vehicle; and there were fluids leaking from the vehicle, the vehicle was blocking the sidewalk, and appeared to be

---

[4] *See* Def.s Ex. A, Whistler video.
[5] Still photo taken from Def.s Ex. A, Whistler video at 14:55:11.
[6] Still photo taken from Def.s Ex. A, Whistler video at 14:54:32.

inoperable.  Based on his observations, Officer Angle determined that the Charger had to be towed.  He obtained a "Crash Report" form and a "Crime Inquiry and Inspection Report/Authorization" (Gov't. Ex. #2, hereinafter "tow sheet") from the trunk of his patrol car at 2:58 p.m.[7]

The Police Department for the City of Cape Girardeau has a written policy (Gov't. Ex. #1) relative to towing vehicles.  The tow policy requires that impounded or seized vehicles be towed.  That also applies to vehicles damaged in traffic accidents.  Officer Angle called for the Charger to be towed.  (Tr. 50.)  The tow policy requires that vehicles be searched prior to being towed.  Officer Angle filled out a tow sheet (Gov't. Ex. #2) reflecting that the Charger was to be towed.

Cape Girardeau Police Officer Cody Owens, an evidence tech, also responded to the scene of the accident.  He, too, was familiar with the tow policy. Officer Owens related that the Police Department's tow policy was "[e]ssentially if a vehicle is inoperable or is causing some type of traffic hazard or pedestrian hazard, it has to be towed." (Tr. 65.)  Officer Owens testified, consistent with the tow policy, that the Charger had to be inventoried before it was towed.  (Tr. 66.)

When Cape Girardeau Police Corporal Cody Farrow arrived on the scene, he noted the Charger was on fire as flames were coming from out of the engine compartment.  He was also familiar with the Police Department's tow policy, including the requirement that the vehicle be inventoried prior to being towed.  He initially inspected the vehicle to be sure there wasn't anything that would pose a danger like

---

[7] *See* Def.s Ex. A, Angle video at 14:58:30.

"obvious aerosols, or anything like that." (Tr. 75.)

Section III E. of the tow policy provides, in pertinent part, "Vehicles impounded or seized by the Department shall be inventoried. All containers, locked, sealed, or unsealed shall be opened to check for hazardous material and the contents inventoried." (Gov't. Ex. #2 at 2.)

Around 3:01 p.m., the fire department was wrapping up the effort to extinguish the fire.[8] About that time, Officer Whistler shared with Cape Girardeau Police Sergeant Blanner that he observed what he estimated to be a couple thousand dollars in cash while conducting a protective frisk of Twiggs after removing him from the Charger. Whistler further commented that the woman who was at the accident scene "was like trying to help him out, but trying to like climb over him into the car, and, uh, he was telling her something, and she took off running."[9] Next, the following exchange occurred:

> Blanner: Have we searched the vehicle?
>
> Whistler: Not yet.
>
> Blanner: Let's go ahead and do that. There's going to be stuff in it.
>
> Whistler: I don't, I don't want to die in a fire, Serge.
>
> Blanner: It's not burnin' now. The heroes came and put it out. [10]

Cpl. Farrow and Officer Owens were ready to initiate a search of the Charger, however, the fire department determined they needed to spray the engine down again.[11]

---

[8] *See* Def.'s Ex. A, Blanner video at 15:01:18.
[9] *Id*., Whistler Video at 15:01:40-15:01:53.
[10] *Id*., at 15:01:54-15:02:05; *see also* Blanner video at 15:01:52-15:02:02.
[11] *Id*., Owens video at 13:02:15.

Page **6** of **10**

Farrow and Owens began an inventory search in earnest at approximately 3:03 p.m.[12] From the rear passenger door, Officer Owens observed a firearm wedged between the driver's seat and the center console. He reported, "Hey, we got a gun right here. . . we got a gun, Whistler."[13] Officer Whistler replied, "Yeah, that's probably what he was havin' her get in here to try to get. 'Cause she was trying to get over him to f---in get in this car."[14] Cpl. Farrow, who was searching from the front passenger side of the Charger, recovered the pistol, rendered it safe, then gave it to Officer Owens. The pistol was a Walther, Model PPX nine-millimeter, semi- automatic pistol. The magazine for the pistol was loaded with 15 rounds of ammunition.

The Missouri Uniform Crash Report (Gov't. Ex. #3) for the accident was prepared by Officer Angle. Twiggs was transported to the hospital. *Id*. at 4. The Charger was towed away by Sperling's Garage. *See* Gov't. Ex. #2.

Twiggs requests suppression of the firearm that was seized from the interior of the Charger.

## II.  Legal Analysis

Twiggs concedes that the Charger was inoperable after the crash and that it needed to be towed from the scene. He also concedes that the police department "has a tow-policy which calls for a pre-tow inventory search." (Doc. 67 at 2.) Twiggs questions whether the search of his car was conducted pursuant to the police department's tow policy, or "whether it was a warrantless search for contraband." (Doc. 67 at 2.) Twiggs claims "[t]he police

---

[12] *Id*., at 15:03:15.
[13] *Id*. at 15:04:22-33.
[14] *Id*. at 15:04:33-40.

assumed [he] was a drug dealer and they wanted to search his car, so they did." *Id*. at 6. He argues that the officers' comments at the scene of the accident support "that claims of an inventory search are merely window dressing for what was in fact a warrantless search for contraband." *Id*. at 5. He further argues that the inevitable discovery doctrine does not apply. The Government responded that the inventory search was proper, and even if it was not a proper search, the inevitable discovery doctrine would apply.

**II.A.   Inventory Search**

Generally, searches conducted without prior approval from a judge are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). Among the exceptions to the warrant requirement is an inventory search. *United States v. Taylor*, 636 F.3d 461, 463-64 (8th Cir. 2011).

The Supreme Court has recognized that a police officer, carrying out community caretaking or administrative duties unrelated to criminal investigations, may sometimes be required to search private property that has lawfully come into official custody." *United States v Rabenberg*, 766 F.2d 355, 356 (8th Cir. 1985) (citing *Illinois v. Lafayette*, 462 U.S. 640 (1983). "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Lafayette*, 462 U.S. at 648. The Eighth Circuit explained:

> The purpose of an inventory search is to protect the "owner's property while it remains in police custody," as well as to protect "police against claims or disputes over lost or stolen property" and "from potential danger[s]." *South Dakota v. Opperman,* 428 U.S. 364, 369, … (1976). An inventory search must "be reasonable under the totality of the circumstances . . . and may not be a ruse for general

Page **8** of **10**

> rummaging in order to discover incriminating evidence." *Taylor*, 636 F.3d at 464 (internal quotation marks omitted). "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *Id.* (Internal quotation marks omitted). However, inventory searches need not be conducted in a totally mechanical, all or nothing fashion." *United States v. Garreau*, 658 F.3d 854, 858 (8th Cir. 2011) (internal quotation marks omitted). And, "[e]ven when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003). "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Id.* (quoting *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993)).

*United States v. Smith*, 715 F.3d 1110, 1117-18 (8th Cir. 2013).

Any inference of investigatory motive is typically vitiated when police conduct the inventory search in accordance with department policy. *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993). An officer's mere suspicion that evidence may be discovered during an inventory search does not itself render the search investigative. *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988) (per curiam). Courts will uphold an inventory search as proper even if it does not precisely conform to department policy so long as "it is not a pretext for an investigatory search." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011). Ultimately, "[t]he central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).

The general belief by the officers who responded to the accident scene that there was likely evidence of a crime in the Charger after Twiggs attempted to flee Officer Whistler at speeds near 100 miles per hour does not invalidate the inventory search. Certainly, the officers were curious as to whether evidence of a crime would be found in the vehicle based

on the circumstances, including that Twiggs continued to attempt to flee after crashing although he was injured. Twiggs' vehicle was totaled, it was blocking a sidewalk, and had to be moved by the authorities. The search of the Charger was reasonable under the totality of the circumstances.

### II.B. Inevitable Discovery

The Government argues in the alternative that if the officers' inventory search "was solely because of an improper motivation to look for contraband, . . .the same firearm would have inevitably been discovered by officers conducting a valid inventory search of the vehicle." (Doc. 70 at 8.) This argument will not be examined as the Court has concluded the inventory search was lawful.

In consideration of the foregoing analysis, Twiggs' request for suppression of evidence that was seized from the Charger should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 47) be **denied**.

Further, the parties are advised that they have until not later than October 6, 2023, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2023.